IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

EQUAL EMPLOYMENT              §
OPPORTUNITY COMMISSION        §
                             §
v.                           §    CIVIL ACTION NO.4:08-CV-558-Y
                             §
CITY OF NORTH RICHLAND HILLS, §
TEXAS                        §

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending before the Court is the Motion for Summary Judgment (doc. #18) filed by defendant the City of North Richland Hills, Texas ("the City").  After review, the Court concludes plaintiff the Equal Employment Opportunity Commission ("EEOC") has presented some evidence in support of its claims for constructive discharge and hostile work environment.  The Court further concludes that the City has not established, as a matter of law, its affirmative defense to the EEOC's claims.  Consequently, the City's motion will be denied.

I.  Background

This case arises out of alleged age-based harassment against Robert Coffman, a heating, ventilation, and air-conditioning technician who, at the time he was hired by the City in July 2000, was 56 years old.  (Resp. App. at 6, 7.)  Coffman worked in the building-services division of the City's support-services department.  (*Id.* at 7.)  At all times relevant to this case, Thomas Powell served as director of the support-services department. (*Id.* at 3.) From the beginning of his employment with

the City until July 20, 2005, Coffman's direct supervisor was
Reggie Washington. (*Id.* at 86, 193.)

Coffman never received a ranking below "meets expectations" on
any of his performance reviews. (*Id.* at 7-85.) And according to
Washington's deposition testimony, Coffman performed his work in a
timely manner with "the best of workmanship possible" and was "on
top of things." (*Id.* at 194-97.) Even so, in early 2006 Coffman
was the subject of an internal investigation for violations of City
policy. (Mot. App. at 1-3.) The investigation related to alleged
violations by Coffman of the City's policy on lunch and break
times, the support-services department's policy requiring employees
to report their location throughout the day, as well as other
department policies. (*Id.*) On February 27, 2006, Powell
interviewed Coffman as part of the investigation and, according to
Powell, his answers indicated that he was in violation of City
policy. (*Id.* at 3, 4-14.) On that same day, Coffman spoke with
Cameron Rowland, an employee in the City's human-resources
department, and requested forms for retirement. (*Id.* at 16-17.)
When asked why he wanted to retire, Coffman explained that Powell
"had enough to fire him" and that he wanted to retire before he was
terminated. (*Id.*) Rowland's recollection of the conversation
indicates that Coffman sought to retire to avoid the termination
being recorded in his employment records. (*Id.*)

According to the EEOC, Coffman's resignation was not driven by

the investigation, but was instead a product of the age-based harassment directed at him by Powell.  When the alleged harassment began is unclear from the EEOC's arguments and evidence, but it relates that, at least as of October 2005, Powell had commented that Coffman was too old to keep up with his work orders (Resp. App. at 158-60, 198-99) and that on at least three occasions, he was getting too old to work in the heat.  (*Id.* at 207.08) Beginning in July 2005, says the EEOC, if Powell saw Coffman at the beginning of a work day he would ask questions such as "Are you going to do anything today?" or, if at the end of a workday, "Did you do anything today?".  (*Id.* at 161-62, 210.)  Powell asked such questions of Coffman three to four times a week.  (*Id.*)  On several instances, Powell accused Coffman of simply trying to maintain his employment with the City until he could retire, and of doing inadequate work in the mean time.  (*Id.* at 204, 235.)  Powell accused Coffman of having a failing memory due to his age.  (*Id.* at 205, 211.)  And the EEOC complains that Coffman engaged in other attacks on Coffman's competence and ability to perform his job, commented that Coffman made "too much" money, and criticized Coffman's continued employment with the City.  Washington was present for some of Powell's comments, and Coffman reported Powell's harassment to Washington on at least three occasions. (*Id.* at 200, 202-03, 205-06.)  The EEOC reports that Coffman told Rowland, in October or November of 2005, that Powell was harassing

3

and belittling him.  (*Id.* at 179.)  Coffman also informed Powell's supervisor, Karen Bostic, that Powell was belittling and harassing him, although the City disputes whether Coffman specifically referred to age-based harassment.  (*Id.* at 168-70; Supp. App. at 1.)

Sometime around July 2005, Washington resigned and Rick Hulme became Coffman's immediate supervisor.  Coffman alleges that Hulme also made comments about Coffman's age.  At one point, after Coffman and Hulme had a disagreement, Hulme stated that if Coffman didn't like the way he managed there was a young kid in Keller who could take Coffman's job.  (Resp. App. at 166.)  Allegedly Hulme also referred to Coffman as "paps," "old timer," and "grandpa." (*Id.* at 245).

On August 6, 2008, the EEOC filed this suit against the City, pursuant to 29 U.S.C. § 626(b), arguing that the statements by Powell and Hulme, as well as other actions taken by these men, constituted age discrimination under the Age Discrimination Enforcement Act ("ADEA").  Specifically, the EEOC argues that Coffman was constructively discharged from his employment with the City, and that he was subjected to a hostile work environment while with the City.  The City now seeks summary judgment on these claims.

II. Discussion

    A.   Standards of Law

        1.  Summary Judgment

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo County.*, 246 F.3d 481, 489 (5th Cir. 2001). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to

5

sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992).  Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994).  Further, the court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party bears the burden of proof on the claim for which it is moving for summary judgment, it must produce evidence establishing "beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190,1194 (5th Cir. 1986).  Such a movant's showing must be such that the court can conclude that no reasonable trier of fact could find other than for the movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the  evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

When the movant has carried its summary-judgment burden, the

6

respondent must go beyond the pleadings and by his own evidence set
forth specific facts showing there is a genuine issue for trial.
*Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004) (citing
*Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e).  This
burden is not satisfied by creating some metaphysical doubt as to
the material facts, by conclusory allegations, by unsubstantiated
assertions, or by only a scintilla of evidence.  *Little v. Liquid
Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the evidence is
merely colorable or is not significantly probative, summary
judgment may be granted.  *Anderson*, 477 U.S. at 249-50.


### 2.  Age Discrimination

An employment-discrimination case may be based on direct or
circumstantial evidence, or both.  *See Russell v. McKinney Hosp.
Venture*, 235 F.3d 219, 222 (5th Cir. 2000). If the plaintiff
produces direct evidence of discrimination, the burden-shifting
framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)
is inapplicable.  *See Sandstad v. CB Richard Ellis*, 309 F.3d 893,
896 (5th Cir. 2002) (citing *Price Waterhouse v. Hopkins*, 490 U.S.
228, 252-53 (1989)).   "Direct evidence is evidence that, if
believed, proves the fact of discriminatory animus without
inference or presumption." *Id.* at 897.  When a plaintiff produces
direct evidence of discrimination, the burden of persuasion shifts
to the defendant to prove that it would have taken the adverse

employment action regardless of discriminatory animus.  *See Price Waterhouse*, 490 U.S. at 252-53.  If, however, a plaintiff relies solely on circumstantial evidence, then his claim is analyzed under the *McDonnell Douglas* framework.

Whether a plaintiff proves his case through direct or circumstantial evidence, he must prove that he suffered an adverse employment action.  *See Sandstad,* 309 F.3d at 897 (discussing elements of a prima-facie case using circumstantial evidence); *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 343-44 (5th Cir. 2002) (discussing use of direct evidence).  A plaintiff may rely on constructive discharge as proof that he has suffered an adverse employment action.  *See McCoy v. City of Shreveport*, 492 F.3d 551, 558-59 (5th Cir. 2007); *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000).  To establish that he has been constructively discharged, a plaintiff must show his working conditions were "so intolerable that a reasonable employee in h[is] position would [have felt] compelled to resign." *Webb v. Cardiothoracic Surgery Assocs., P.A.*, 139 F.3d 532, 539 (5th Cir. 1998).  "Mere harassment, alone, is insufficient; rather, the plaintiff must show 'aggravating factors' to justify departure." *Hockman v. Westward Communs., LLC*, 407 F.3d 317, 331 (5th Cir. 2004).  "Such factors include (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger

supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Id.* at 331-32.

### 3. Hostile Work Environment

The United States Court of Appeals for the Fifth Circuit has yet to decide whether a hostile-work-environment claim is available under the ADEA. *See Mitchell v. Snow*, No. 08-20448, 2009 U.S. App. LEXIS 13083, at *2 n.2 (5th Cir. June 17, 2009). But that court has assumed as much on multiple occasions. *See id.; see also McNealy v. Emerson Elec. Co.*, 121 Fed. App'x 29, 34 n.1 (5th Cir. 2005). Neither party has briefed the issue; instead, both sides appear to assume that the cause of action is available. Thus, without authority to the contrary, the Court will do so as well. To establish a claim for hostile work environment, a plaintiff must prove that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on the plaintiff's membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *See Celestine v. Petroleos de Venez, SA*, 266 F.3d 343, 353 (5th Cir. 2001). In determining whether a work environment is

9

hostile, all circumstances are considered including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). "To survive summary judgment, the harassment must be so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the work place." *Hockman*, 407 F.3d at 326. "The alleged conduct must be more than rude or offensive comments, teasing, or isolated incidents." *Id.* And implicit or explicit in the harassment must be that the plaintiff is incompetent because of his membership in the protected class. *Id.*

   B.  Analysis

      1.  Hostile Work Environment

According to the City, the EEOC has not produced sufficient evidence that any age-based remarks or discriminatory conduct by Coffman's supervisors affected a term, condition, or privilege of employment. "For harassment to affect a term, condition, or privilege of employment, it must be both objectively and subjectively abusive." *Hockman*, 407 F.3d at 325. As for whether an environment is objectively abusive, a court is to consider all of the circumstances in light of such factors as the frequency of

10

the alleged discriminatory conduct, its severity, whether the conduct is physically threatening or humiliating, whether the conduct unreasonably interferes with the employee's work, and whether the conduct unreasonably undermines the employee's workplace competence. *Id.* at 325-26.

The EEOC has produced no evidence that Coffman's ability to perform his duties has been compromised by the alleged discriminatory conduct. According to Coffman's deposition, Hulme "micro managed" the details of Coffman's work and assumed Coffman's duties for one project. (Resp. App. at 177-78.) The EEOC has also produced evidence that, on one occasion, Hulme required Coffman—a heating, ventilation, and air conditioning technician--to plunge a toilet, a task that Coffman characterizes as menial. (*Id.* at 236-37.) But one could hardly conclude that these events show that Coffman's work was unreasonably affected. The EEOC has also produced evidence that during the period that the alleged harassment was occurring, Coffman was diagnosed with high blood pressure and heart disease. (Resp. App. at 91-96.) The EEOC appears to offer this as evidence that the harassment directed at Coffman manifested itself in physical symptoms. While this may be the case, the EEOC has offered no evidence that Coffman's health problems were, in fact, caused by stress related to harassment.

The EEOC has produced evidence that offensive comments, many of which were age related, were directed at Coffman by Powell and

11

Hulme.  According to the deposition of one of Coffman's coworkers,
Powell made a derogatory comment about Coffman virtually every time
the two saw each other.  (*Id.* at 226-27.)  Powell called Coffman an
"old man" on "numerous" occasions, "constantly" called Coffman too
slow in his work, and called Coffman stupid on fifteen to twenty
occasions.  (*Id.* at 229-31.)  The EEOC has also produced evidence
that on approximately four occasions Powell suggested that Coffman
was getting too old to do his job, particularly in the heat.  (*Id.*
at 158-59; 198-99; 207-08.)  Powell accused Coffman of having a
failing memory due to his age.  After Coffman forgot to perform one
of his assignments, Powell stated something to the effect that
Coffman was getting too old and that his memory was failing.  (*Id.*
at 208.)  Powell blamed other memory lapses and misplaced items on
Coffman's age.  (*Id.* at 211, 227.)  Powell accused Coffman of
making too much money and characterized his continued employment
with the City as "stealing," asking Coffman three to four times a
week a question to the effect of "Are you going to do anything
today?".  (*Id.* at 161-62, 164-65, 201, 210, 226.)  Similarly,
Powell accused Coffman of "milking it," or riding out his
employment with the City until he qualified for retirement, on at
least three occasions.  (*Id.* at 204.)

    Summary-judgment evidence suggests that Hulme also made
offensive and derogatory remarks to Coffman.  When Hulme instructed
Coffman to work on a free-standing ice machine, Coffman told Hulme

that Powell had instructed him never to work on any equipment not attached to a building. (*Id.* at 166.)  Hulme responded by saying that if Coffman didn't like the way he managed there was a young kid in Keller who could take Coffman's job. (*Id.*)  And there is evidence that Hulme referred to Coffman as "paps," "old timer," and "grandpa." (*Id.* at 245).

Moreover, there is evidence that Powell's comments were made in such a way as to embarrass Coffman.  As noted, Powell made a derogatory comment to Coffman every time he saw Coffman.  Powell made his comments regardless of who was present. (*Id.* at 226-27.) Powell made derogatory remarks in front of Coffman's immediate supervisor, other support-department employees, and administrators. (*Id.* at 198-99, 203-04, 220, 234-35, 258-60.)  And Powell's comments were not simply observations about Coffman's age, but instead accused Coffman of being stupid, incompetent, slow, blind, and suffering from a failing memory. (*Id.* at 223-25, 232-33.)

Admittedly, in isolation, the nature of the remarks made by Powell and Hulme may not be as severe as other statements that have been deemed sufficient to support a hostile-work-environment claim. *See Hockman*, 407 F.3d at 326-29 (comparing cases).  And the City has argued that many of the comments do not even refer to age.  But taken in context, a jury could certainly infer that even those comments that did not explicitly refer to age were driven by Coffman's age.  Indeed, there is evidence that, after Coffman

13

resigned, Powell stated that he was tired of seeing an old man doing work for the department. (*Id.* at 221.) Evidence was adduced that Powell also stated that Coffman was incapable of doing his job because he was too old and that Powell had wanted to see someone younger do the job. (*Id.* at 222.) Similarly, Hulme stated after Coffman resigned that one of his "top priorities" had been to "get rid of" Coffman, and that it was Powell that had assigned Hulme this task. (*Id.* at 238-39.) The City complains that such statements, made after Coffman resigned, have no bearing on whether Coffman subjectively perceived his work environment as hostile, or whether a reasonable employee would perceive it as such. But evidence of Powell's discriminatory motive is certainly admissible to contextualize statements that otherwise do not necessarily relate to age, such as comments on Coffman's eyesight, memory, and competence. *Cf. Jurgens v. EEOC*, 903 F.2d 386, 393 n.10 (5th Cir. 1990) (noting that although the Fifth Circuit has adopted a reasonable-employee analysis for constructive-discharge claims, any evidence suggesting an invidious intent on the part of the employer is relevant to the analysis).

The City next complains that the EEOC's brief mischaracterizes statements by Powell and Hulme or takes them out of context. For instance, the EEOC's brief cites Washington's deposition as proof that Powell stated that Coffman was too old to take the heat on "multiple occasions." (Resp. Br. at 9.) The City, noting that

14

Washington specifies that he heard Powell make such a comment "maybe three times" (Resp. App. at 207), argues that the EEOC's use of the word "multiple" mischaracterizes Washington's testimony in an attempt to make Powell's remarks appear to be more frequent than they actually were.  But such a dispute--the weight to be given to evidence--is not a question to be decided in the context of a motion for summary judgment.

The City cites other instances in which the EEOC has allegedly taken evidence out of context.  The City explains that Powell's comments that Coffman might be too old to work on the roof in the summer heat were in response to Coffman's own statements that he did not like such work, and the fact that Coffman would take an umbrella with him when working on a roof.  (Mot. App. At 207-08.) According to the City, other workers found this amusing, and the comments were not meant to be offensive.  Similarly, the City contends that Powell's asking of Coffman whether he was going to do anything today was meant as a joke, and that Coffman took it as a joke, given that he would respond "no, and I'm not going to do anything tomorrow."  (Supp. App. at 18.)  But again, these arguments call upon the Court to interpret and weigh the summary-judgment evidence, something the Court cannot do.

The City also argues that the alleged discrimination is not subjectively abusive enough to support a hostile-work-environment claim.  The City notes that during Coffman's deposition he did not

15

recount many of the events the EEOC now relies on in responding to the motion for summary judgment.  Even so, there is evidence that the statements were made, that Coffman found such statements offensive, and that the statements influenced Coffman's decision to resign.  (Resp. App. at 169, 216.)

The City further argues that it was not given a chance to take remedial action regarding any discriminatory statements because Coffman did not properly report the alleged discrimination.  As part of its hostile-work-environment claim, the EEOC must show that the City knew or should have known of the harassment in question and failed to take prompt remedial action.  *See Celestine*, 266 F.3d at 353.  According to the City, under the plain terms of its "Sexual and Other Unlawful Harassment" Policy, Coffman was required to report the alleged harassment to his "Department Director, the Human Resources Director, an Assistant City Manager, or the City Manager."  (Resp. App. at 1.)  The City argues that Coffman never reported his claims of harassment to any of the officials listed in this policy.

But after the City's policy was instituted, a "Policies and Procedures" manual specifically for the support-services department was adopted.  (*Id.* at 105-142.)  This manual states that "[a]ny employee who wishes to report an incident of sexual or other unlawful harassment should promptly report the matter to his or her supervisor."  (*Id.* at 136.)  Additionally, the city-wide policy

16

provides that "[a]ny supervisor or manager who becomes aware of possible sexual or other unlawful harassment must immediately advise his or her Department Director as well as the Human Resources Director, an Assistant City Manager or the City Manager." (*Id.* at 2.)  Coffman reported Powell's remarks to his immediate supervisor, Washington, on at least three occasions.  (*Id.* at 200, 202-03, 205-06.)  The City never explains why Coffman's complaints to Washington, which clearly complied with the departmental policy and which, under the City policy, should have caused Washington to pass the complaint up the chain of command to the officials identified in the City policy, is not sufficient to create a fact issue on whether it knew or should have known of the alleged harassment.

### 2.  Age Discrimination

The City has not addressed whether the EEOC has produced direct evidence of discrimination and has not otherwise argued whether the *McDonnell Douglas* framework applies to this case.  The EEOC does not argue that it has produced direct evidence either.  But as noted, under either the *McDonnell Douglas* or *Price Waterhouse* framework, the employee must have suffered an adverse employment action to support an age-discrimination claim.

The EEOC argues that it has produced evidence demonstrating that Coffman's duties were reduced or altered.  According to

17

Coffman's deposition, Hulme stepped in on one project and assumed the role that Coffman would normally serve.  (Resp. App. at 177.) Coffman also claims Hulme "micro managed" the details of his work. (*Id.* at 178.)  The EEOC has also produced evidence that, on one occasion, Hulme required Coffman--a heating, ventilation, and air conditioning technician--to plunge a toilet, a task that Coffman characterizes as menial.  (*Id.* at 236-37.)  But such minor and isolated deviations from Coffman's normal duties are not significant enough to amount to adverse employment actions.  *See McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (noting that, in discrimination cases, adverse employment actions include decisions regarding hiring, granting leave, discharging, promoting, or compensating); *see also Aryain v. Wal-Mart Stores Tex., L.P.*, 534 F.3d 473, 481 (5th Cir. 2008) (affirming summary judgment for defendant despite plaintiff's claim she had been reassigned to menial and degrading work) *abrogated on other grounds Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999) (reasoning that a change in schedule and assignment to new tasks was not an adverse employment action); *Roberts v. Unitrin Specialty Lines Ins. Co.*, No. 3:06-CV-0380-B, 2008 WL 3832223, *9 (N.D. Tex. Aug. 14, 2008) (concluding that removing one project from the plaintiff did not amount to an adverse employment action).

These facts may also be considered under the constructive-

18

discharge factors which, among other things, take into account whether the employee's responsibilities have been reduced and whether the employee has been reassigned to menial or degrading work. *See Hockman*, 407 F.3d at 331. Indeed, in attempting to establish an adverse employment action, the EEOC appears to rely exclusively on the theory that Coffman was constructively discharged, and the constructive-discharge issue is the focus of the City's motion regarding the age-discrimination claim. The fact that Hulme took over one of Coffman's projects and the fact that Coffman was ordered to plunge a toilet on one occasion are far from enough to support a constructive-discharge claim. *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 652 (5th Cir. 2004) (concluding that having one's work micromanaged does not amount to constructive discharge); *Brown v. Bunge Corp.*, 207 F.3d 776, 782-83 (5th Cir. 2000) (concluding reduction in responsibilities and demotion did not constitute constructive discharge).

Of course, the bulk of the EEOC's evidence is of statements made by Powell and Hulme. Whether these statements are sufficient to support a constructive-discharge claim is evaluated from the perspective of a reasonable employee. A reasonable employee does not assume the worst, does not jump to conclusions, and reports harassment so that the employer may take remedial action. *Aryain*, 534 F.3d at 481. According to the City, when faced with an investigation and the possibility of termination, Coffman

19

immediately sought to retire.  But as recounted above in relation to the hostile-work-environment claim, there is a good deal of evidence that both Powell and Hulme made discriminatory remarks to and about Coffman before Coffman's decision to retire.  There is also evidence that Powell and Hulme made these comments with the intent that Coffman resign, such as Powell's statement that Coffman was incapable of doing his job because he was too old and that Powell had wanted to see someone younger do the job. *Jurgens*, 903 F.2d at 393 n.10 (noting that evidence of invidious intent is relevant to a constructive-discharge claim).  Further, there is evidence that Hulme stated that Coffman could be replaced by a younger man.  (Resp. App. at 166.)

And there is evidence that Coffman did not simply jump to a conclusion and resign before taking any remedial measures.  Rather, Coffman reported Powell's treatment of him on multiple occasions, both to his immediate supervisor Washington, as well as to Rowland in the human resources department.  The City complains that this course of action did not satisfy the City's policy on reporting harassment.  But as discussed above, the support-services department had its own policy that allowed an employee to report harassment to an immediate supervisor and even the City's policy required that an immediate supervisor pass a complaint of harassment along to the proper officials.  This, along with the evidence that Coffman had been the target of significant age-based

20

harassment intended to cause his resignation--and Hulme's statement that could be taken as a threat to replace Coffman with a younger man--is sufficient to prevent summary judgment on the constructive-discharge claim. *See Hockman* 407 F.3d at 331-32 (listing harassment of an employee calculated to encourage the employee's resignation as an aggravating factor indicating a constructive discharge has occurred).

### 3. Affirmative Defense

Finally, the City argues that it has established an affirmative defense to both of the EEOC's claims. As a defense to such claims, the City may show by a preponderance of the evidence that it exercised reasonable care to prevent and correct promptly any harassing behavior, and that Coffman unreasonably failed to take advantage of any preventative or corrective opportunities provided by the City. *Aryain*, 534 F.3d at 482. But this defense is only available if no "tangible employment action" has been taken against the aggrieved employee. *See id.* at 479 n.3. As discussed above, there is some evidence that Coffman suffered a constructive discharge, which is a tangible employment action. *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 410 n.15 (5th Cir. 2002).

Additionally, the EEOC has presented enough evidence to create a fact issue on whether Coffman acted reasonably in taking corrective action. Coffman reported the harassment to his

immediate supervisor, Washington, as well as to Rowland in human resources.  There is also evidence that Coffman complained about Powell's harassment to Karen Bostic, who at the time was Powell's supervisor.  Although the City's evidence suggests that Coffman's complaint to Bostic did not refer to age-based harassment, there is enough evidence to create a fact issue on whether Coffman acted reasonably.

III.  Conclusion

The EEOC has produced sufficient evidence on the issues raised by the City regarding the claims for constructive discharge and hostile work environment to create a fact issue and prevent summary judgment.  Additionally, the City has not established, as a matter of law, its affirmative defense.  Accordingly, the City's motion for summary judgment is DENIED.

SIGNED: October 14, 2009.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

22